EXHIBIT 1A

## FORM OF SELLER'S OFFICER'S CERTIFICATE

I, _____, hereby certify that I am the duly elected _____ of Innovative Mortgage Capital, LLC, a _____ ("Innovative"), and further certify, on behalf of the Innovative as follows:

1.    Attached hereto as Attachment I are a true and correct copy of the Certificate of Incorporation and by-laws of the Innovative as are in full force and effect on the date hereof.

2.    No proceedings looking toward merger, liquidation, dissolution or bankruptcy of Innovative are pending or contemplated.

3.    Each person who, as an officer or attorney-in-fact of Innovative, signed (a) the Master Mortgage Loan Purchase and Interim Servicing Agreement (the "Purchase Agreement"), dated as of October 1, 2005 by and among Innovative Mortgage Capital, LLC, as a Seller and Interim Servicer, Mortgage Loan Specialists, Inc. as a Seller and DB Structured Products, Inc. (the "Purchaser"); (b) the Commitment Letter, dated _____ __, 200_, between the Innovative and the Purchaser (the "Commitment Letter"); and (c) any other document delivered prior hereto or on the date hereof in connection with the sale and servicing of the Mortgage Loans in accordance with the Purchase Agreement and the Commitment Letter was, at the respective times of such signing and delivery, and is as of the date hereof, duly elected or appointed, qualified and acting as such officer or attorney-in-fact, and the signatures of such persons appearing on such documents are their genuine signatures.

4.    Attached hereto as Attachment II is a true and correct copy of the resolutions duly adopted by the board of directors of the Innovative on _____, 200_ (the "Resolutions") with respect to the authorization and approval of the sale and servicing of the Mortgage Loans; said Resolutions have not been amended, modified, annulled or revoked and are in full force and effect on the date hereof.

5.    Attached hereto as Attachment III is a Certificate of Good Standing of the Seller dated _____, 200_. No event has occurred since _____, 200_ which has affected the good standing of the Innovative under the laws of the State of _____.

6.    Attached hereto as Attachment IV is a copy of each license of Innovative to originate and sell the Mortgage Loans.  No such licenses have been suspended or revoked by any court, administrative agency, arbitrator or governmental body and no proceedings are pending which might result in such suspension or revocation.

2-1

7.    All of the representations and warranties of Innovative contained in Subsections 7.01 and 7.02 of the Purchase Agreement were true and correct in all material respects as of the date of the Purchase Agreement and are true and correct in all material respects as of the date hereof.

8.    Innovative has performed all of its duties and has satisfied all the material conditions on its part to be performed or satisfied prior to the related Closing Date pursuant to the Purchase Agreement and the related Commitment Letter.

All capitalized terms used herein and not otherwise defined shall have the meaning assigned to them in the Purchase Agreement.

IN WITNESS WHEREOF, I have hereunto signed my name and affixed the seal of Innovative.

Dated:_____

[Seal]

INNOVATIVE MORTGAGE CAPITAL, LLC
(Seller)

By:_____
Name:_____
Title: Vice President

I, _____, Secretary of the Seller, hereby certify that _____ is the duly elected, qualified and acting Vice President of the Seller and that the signature appearing above is genuine.

IN WITNESS WHEREOF, I have hereunto signed my name.

Dated:_____

[Seal]

INNOVATIVE MORTGAGE CAPITAL, LLC
(Seller)

By:_____
Name:_____
Title: [Assistant] Secretary

2-2

[TPW: NYLEGAL:385167.4] 17988-00374  10/17/2005 06:46 PM

EXHIBIT 1B

## FORM OF SELLER'S OFFICER'S CERTIFICATE

I, _____, hereby certify that I am the duly elected _____ of Mortgage Loans Specialists, Inc. a _____ ("MLSI"), and further certify, on behalf of MLSI as follows:

    1.    Attached hereto as Attachment I are a true and correct copy of the Certificate of Incorporation and by-laws of MLSI as are in full force and effect on the date hereof.

    2.    No proceedings looking toward merger, liquidation, dissolution or bankruptcy of MLSI are pending or contemplated.

    3.    Each person who, as an officer or attorney-in-fact of MLSI, signed (a) the Master Mortgage Loan Purchase and Interim Servicing Agreement (the "Purchase Agreement"), dated as of October 1, 2005 by and among Innovative Mortgage Capital, LLC, as a Seller and Interim Servicer, Mortgage Loan Specialists, Inc., as a Seller and DB Structured Products, Inc. (the "Purchaser"); (b) the Commitment Letter, dated _____ __, 200_, among the Innovative and the Purchaser (the "Commitment Letter"); and (c) any other document delivered prior hereto or on the date hereof in connection with the sale and servicing of the Mortgage Loans in accordance with the Purchase Agreement and the Commitment Letter was, at the respective times of such signing and delivery, and is as of the date hereof, duly elected or appointed, qualified and acting as such officer or attorney-in-fact, and the signatures of such persons appearing on such documents are their genuine signatures.

    4.    Attached hereto as Attachment II is a true and correct copy of the resolutions duly adopted by the board of directors of MLSI on _____, 200_ (the "Resolutions") with respect to the authorization and approval of the sale and servicing of the Mortgage Loans; said Resolutions have not been amended, modified, annulled or revoked and are in full force and effect on the date hereof.

    5.    Attached hereto as Attachment III is a Certificate of Good Standing of the MLSI dated _____, 200_. No event has occurred since _____, 200_ which has affected the good standing of the Seller under the laws of the State of _____.

    6.    Attached hereto as Attachment IV is a copy of each license of MLSI to originate and sell the Mortgage Loans. No such licenses have been suspended or revoked by any court, administrative agency, arbitrator or governmental body and no proceedings are pending which might result in such suspension or revocation.

2-3

7.    All of the representations and warranties of MLSI contained in Subsections 7.01 and 7.02 of the Purchase Agreement were true and correct in all material respects as of the date of the Purchase Agreement and are true and correct in all material respects as of the date hereof.

8.    MLSI has performed all of its duties and has satisfied all the material conditions on its part to be performed or satisfied prior to the related Closing Date pursuant to the Purchase Agreement and the related Commitment Letter.

All capitalized terms used herein and not otherwise defined shall have the meaning assigned to them in the Purchase Agreement.

IN WITNESS WHEREOF, I have hereunto signed my name and affixed the seal of the Seller.

Dated:_____

[Seal]

MORTGAGE LOAN SPECIALISTS, INC.
(Seller)

By:_____
Name:_____
Title:

I, _____, Secretary of the Seller, hereby certify that _____ is the duly elected, qualified and acting Vice President of the Seller and that the signature appearing above is genuine.

IN WITNESS WHEREOF, I have hereunto signed my name.

Dated:_____

[Seal]

MORTGAGE LOAN SPECIALISTS, INC.
(Seller)

By:_____
Name:_____
Title:

2-4

<u>EXHIBIT 2</u>

FORM OF OPINION OF COUNSEL TO THE SELLER

_____
(Date)

DB Structured Products, Inc.
60 Wall Street
New York, New York 10005

Re:   Master Mortgage Loan Purchase and Interim Servicing
      Agreement, dated as of October 1, 2005

Gentlemen:

I have acted as counsel to [Innovative Mortgage Capital, LLC ("Innovative")][a _____ corporation][and][Mortgage Loan Specialists, Inc. ("MLSI")], a _____ corporation (the "Sellers'), in connection with the sale of certain mortgage loans by the Seller to DB Structured Products, Inc. (the "Purchaser") pursuant to (i) a Master Mortgage Loan Purchase and Interim Servicing Agreement, dated as of October 1, 2005, by and among Innovative Mortgage Capital, LLC, as a Seller and Interim Servicer, Mortgage Loan Specialists, Inc., as a Seller and the Purchaser (the "Purchase Agreement"), and the Commitment Letter, dated _____ __, 200_, between  Innovative and the Purchaser (the "Commitment Letter"). Capitalized terms not otherwise defined herein have the meanings set forth in the Purchase Agreement.

In connection with rendering this opinion letter, I, or attorneys working under my direction, have examined, among other things, originals, certified copies or copies otherwise identified to my satisfaction as being true copies of the following:

A.   The Purchase Agreement;
B.   The Commitment Letter;
C.   [Innovative's][MLSI's]  Certificate of Incorporation and By-Laws, as amended to date; and
D.   Resolutions adopted by the board of directors of [Innovative][MLSI]with specific reference to actions relating to the transactions covered by this opinion (the "Resolutions").

For the purpose of rendering this opinion, I have made such documentary, factual and legal examinations as I deemed necessary under the circumstances. As to factual matters, I have relied upon statements, certificates and other assurances of public officials and of officers and other representatives of [Innovative][MLSI] , and upon such other certificates as I deemed appropriate, which factual matters have not been independently established or verified by me. I

2-1

have also assumed, among other things, the genuineness of all signatures, the legal capacity of all natural persons, the authenticity of all documents submitted to me as originals, and the conformity to original documents of all documents submitted to me as copies and the authenticity of the originals of such copied documents.

On the basis of and subject to the foregoing examination, and in reliance thereon, and subject to the assumptions, qualifications, exceptions and limitations expressed herein, I am of the opinion that:

1.    [Innovative][MLSI] has been duly incorporated and is validly existing and in good standing under the laws of the State of _____ with corporate power and authority to own its properties and conduct its business as presently conducted by it. [Innovative][MLSI] has the corporate power and authority to service the Mortgage Loans, and to execute, deliver, and perform its obligations under the Purchase Agreement and the Commitment Letter (sometimes collectively, the "Agreements").

2.    The Purchase Agreement and the Commitment Letter have been duly and validly authorized, executed and delivered by the [Innovative][MLSI].

3.    The Purchase Agreement and the Commitment Letter constitute valid, legal and binding obligations of [Innovative][MLSI], enforceable against [Innovative][MLSI] in accordance with their respective terms.

4.    No consent, approval, authorization or order of any state or federal court or government agency or body is required for the execution, delivery and performance by the Seller of the Purchase Agreement and the Commitment Letter, or the consummation of the transactions contemplated by the Purchase Agreement and the Commitment Letter, except for those consents, approvals, authorizations or orders which previously have been obtained.

5.    Neither the servicing of the Mortgage Loans by [Innovative][MLSI] as provided in the Purchase Agreement and the Commitment Letter, nor the fulfillment of the terms of or the consummation of any other transactions contemplated in the Purchase Agreement and the Commitment Letter will result in a breach of any term or provision of the certificate of incorporation or by-laws of[Innovative][MLSI], or, to the best of my knowledge, will conflict with, result in a breach or violation of, or constitute a default under, (i) the terms of any indenture or other agreement or instrument known to me to which the [Innovative][MLSI] is a party or by which it is bound, (ii) any State of _____ or federal statute or regulation applicable to [Innovative][MLSI], or (iii) any order of any State of _____ or federal court, regulatory body, administrative agency or governmental body having jurisdiction over [Innovative][MLSI], except in any such case where the default, breach or violation would not have a material adverse effect on [Innovative][MLSI] or its ability to perform its obligations under the Purchase Agreement.

2-2

6.    There is no action, suit, proceeding or investigation pending or, to the best of my knowledge, threatened against [Innovative][MLSI] which, in my judgment, either in any one instance or in the aggregate, would draw into question the validity of the Purchase Agreement or which would be likely to impair materially the ability of [Innovative][MLSI] to perform under the terms of the Purchase Agreement.

7.    The sale of each Mortgage Note and Mortgage as and in the manner contemplated by the Purchase Agreement is sufficient fully to transfer to the Purchaser all right, title and interest of [Innovative][MLSI] thereto as noteholder and mortgagee.

8.    The Assignments of Mortgage are in recordable form and upon completion will be acceptable for recording under the laws of the State of _____. When endorsed, as provided in the Purchase Agreement, the Mortgage Notes will be duly endorsed under _____ law.

The opinions above are subject to the following additional assumptions, exceptions, qualifications and limitations:

A.    I have assumed that all parties to the Agreements other than the [Innovative][MLSI] have all requisite power and authority to execute, deliver and perform their respective obligations under each of the Agreements, and that the Agreements have been duly authorized by all necessary corporate action on the part of such parties, have been executed and delivered by such parties and constitute the legal, valid and binding obligations of such parties.

B.    My opinion expressed in paragraphs 3 and 7 above is subject to the qualifications that (i) the enforceability of the Agreements may be limited by the effect of laws relating to (1) bankruptcy, reorganization, insolvency, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally, including, without limitation, the effect of statutory or other laws regarding fraudulent conveyances or preferential transfers, and (2) general principles of equity upon the specific enforceability of any of the remedies, covenants or other provisions of the Agreements and upon the availability of injunctive relief or other equitable remedies and the application of principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) as such principles relate to, limit or affect the enforcement of creditors' rights generally and the discretion of the court before which any proceeding for such enforcement may be brought; and (ii) I express no opinion herein with respect to the validity, legality, binding effect or enforceability of (a) provisions for indemnification in the Agreements to the extent such provisions may be held to be unenforceable as contrary to public policy or (b) Section 18 of the Purchase Agreement.

C.    I have assumed, without independent check or certification, that there are no agreements or understandings among [Innovative][MLSI], the Purchaser and any other party which would expand, modify or otherwise affect the terms of the documents described herein or the respective rights or obligations of the parties thereunder.

2-3

I am admitted to practice in the State of _____, and I render no opinion herein as to matters involving the laws of any jurisdiction other than the State of _____ and the Federal laws of the United States of America.

Very truly yours,

[TPW: NYLEGAL:385167.4] 17988-00374  10/17/2005 06:46 PM

## EXHIBIT 3

### FORM OF SECURITY RELEASE CERTIFICATION

I.    Release of Security Interest

_____, hereby relinquishes any and all right, title and interest it may have in and to the Mortgage Loans described in Exhibit A attached hereto upon purchase thereof by DB Structured Products, Inc. from the Seller named below pursuant to that certain Master Mortgage Loan Purchase and Interim Servicing Agreement, dated as of October 1, 2005, as of the date and time of receipt by _____ of $_____ for such Mortgage Loans (the "Date and Time of Sale"), and certifies that all notes, mortgages, assignments and other documents in its possession relating to such Mortgage Loans have been delivered and released to the Seller named below or its designees as of the Date and Time of Sale.

Name and Address of Financial Institution

_____
(Name)


_____
(Address)


By:_____

3-1

## II.    Certification of Release

The Seller named below hereby certifies to DB Structured Products, Inc. that, as of the Date and Time of Sale of the above mentioned Mortgage Loans to DB Structured Products, Inc., the security interests in the Mortgage Loans released by the above named corporation comprise all security interests relating to or affecting any and all such Mortgage Loans. The Seller named below warrants that, as of such time, there are and will be no other security interests affecting any or all of such Mortgage Loans.

[INNOVATIVE    MORTGAGE    CAPITAL,    LLC]
[MORTGAGE LOAN SPECIALISTS, INC.]
Seller


By:_____
Name:_____
Title:_____

3-2

EXHIBIT 4

## ASSIGNMENT AND CONVEYANCE

On this _____ day of _____, 200_, Innovative Mortgage Capital, LLC (the "Interim Servicer") and Mortgage Loan Specialists, Inc. (together with the Interim Servicer, the "Sellers"), a Sellers under that certain Master Mortgage Loan Purchase and Interim Servicing Agreement, dated as of October 1, 2005 (the "Agreement"), does hereby sell, transfer, assign, set over and convey to DB Structured Products, Inc. as Purchaser under the Agreement, without recourse, but subject to the terms of the Agreement, all rights, title and interest of the Sellers in and to the Mortgage Loans listed on the Mortgage Loan Schedule attached hereto as Schedule One, together with the related Mortgage Files and all rights and obligations arising under the documents contained therein. Pursuant to Subsection 6.03 of the Agreement, the Sellers have delivered or shall deliver to the Custodian the Mortgage Loan Documents for each Mortgage Loan to be purchased and such other documents as set forth in the Agreement. The contents of each related Servicing File required to be retained by the Interim Servicer to service the Mortgage Loans pursuant to the Agreement and thus not delivered to the Purchaser are and shall be held in trust by the Interim Servicer for the benefit of the Purchaser as the owner thereof. The Interim Servicer's possession of any portion of each such Servicing File is at the will of the Purchaser for the sole purpose of facilitating servicing of the related Mortgage Loan pursuant to the Agreement, and such retention and possession by the Interim Servicer shall be in a custodial capacity only. The ownership of each Mortgage Note, Mortgage, and the contents of the Mortgage File and Servicing File is vested in the Purchaser and the ownership of all records and documents with respect to the related Mortgage Loan prepared by or which come into the possession of the Interim Servicer shall immediately vest in the Purchaser and shall be retained and maintained, in trust, by the Interim Servicer at the will of the Purchaser in such custodial capacity only.

The Sellers confirm to the Purchaser that the representations and warranties set forth in Subsections 7.01 and 7.02 of the Agreement and in the Commitment Letter, dated _____ __, 200_, are true and correct as of the date hereof, and that all statements made in each Seller's Officer's Certificate and all attachments thereto remain complete, true and correct in all respects as of the date hereof.

[The Sellers further represent and warrant to the Purchaser that the Option ARM Mortgage Loans listed on the Mortgage Loan Schedule attached hereto as Schedule One were originated pursuant to the Underwriting Guidelines of _____ which were effective as of _____, 200__.]

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Agreement.

[SIGNATURE PAGE FOLLOWS]

[TPW: NYLEGAL:385167.4] 17988-00374 10/17/2005 06:46 PM

INNOVATIVE MORTGAGE CAPITAL, LLC
(Seller and Interim Servicer)

By:_____

Name:_____

Title:_____


MORTGAGE LOAN SPECIALISTS, INC.
(Seller)

By:_____

Name:_____

Title:_____

[TPW: NYLEGAL:385167.4] 17988-00374  10/17/2005 06:46 PM

## EXHIBIT 5

### CONTENTS OF EACH MORTGAGE FILE

With respect to each Mortgage Loan, the Mortgage File shall include each of the following items, which shall be available for inspection by the Purchaser and which shall be retained by the Seller or delivered to the Custodian:

1. Mortgage Loan Documents.

2. Residential loan application.

3. Mortgage Loan closing statement.

4. Verification of employment and income, if required pursuant to the related Mortgage Loan's origination program.

5. Verification of acceptable evidence of source and amount of downpayment, if required pursuant to the related Mortgage Loan's origination program.

6. Credit report on Mortgagor.

7. Residential appraisal report.

8. Photograph of the Mortgaged Property.

9. Survey of the Mortgaged Property.

10. Copy of each instrument necessary to complete identification of any exception set forth in the exception schedule in the title policy, i.e., map or plat, restrictions, easements, sewer agreements, home association declarations, etc.

11. All required disclosure statements and statement of Mortgagor confirming receipt thereof.

12. If available, termite report, structural engineer's report, water potability and septic certification.

13. Sales Contract, if applicable.

14. Hazard insurance policy.

[TPW: NYLEGAL:385167.4] 17988-00374  10/17/2005 06:46 PM

15.  Tax receipts, insurance premium receipts, ledger sheets, payment history from date of origination, insurance claim files, correspondence, current and historical computerized data files, and all other processing, underwriting and closing papers and records which are customarily contained in a mortgage loan file and which are required to document the Mortgage Loan or to service the Mortgage Loan.

16.  Amortization schedule, if available.

17.  Payment history for Mortgage Loans that have been closed for more than 90 days.

5-2

## EXHIBIT 6

FORM OF CUSTODIAL ACCOUNT LETTER AGREEMENT

_____, 200___

To:    _____
       _____
       _____

(the "Depository")

      As Interim Servicer under the Master Mortgage Loan Purchase and Interim Servicing Agreement, dated as of October 1, 2005, we hereby authorize and request you to establish an account, as a Custodial Account, to be designated as "Innovative Mortgage Capital, LLC in trust for DB Structured Products, Inc." All deposits in the account shall be subject to withdrawal therefrom by order signed by such Seller. You may refuse any deposit which would result in violation of the requirement that the account be fully insured as described below. This letter is submitted to you in duplicate. Please execute and return one original to us.

INNOVATIVE MORTGAGE CAPITAL, LLC
(Interim Servicer)

By:_____

Name:_____

Title:_____

Date:_____

6-1

[TPW: NYLEGAL:385167.4] 17988-00374  10/17/2005 06:46 PM

The undersigned, as Depository, hereby certifies that the above-described account has been established under Account Number _____ at the office of the Depository indicated above, and agrees to honor withdrawals on such account as provided above. The full amount deposited at any time in the account will be insured by the Federal Deposit Insurance Corporation through the Bank Insurance Fund ("BIF") or the Savings Association Insurance Fund ("SAIF").

<br>

|                              |
|------------------------------|
| Depository                   |

By:_____

Name:_____

Title:_____

Date:_____

6-2

# EXHIBIT 7

## FORM OF ESCROW ACCOUNT LETTER AGREEMENT

_____, 200__

To:    _____

_____

_____

(the "Depository")

As Interim Servicer under the Master Mortgage Loan Purchase and Interim Servicing Agreement, dated as of October 1, 2005, we hereby authorize and request you to establish an account, as an Escrow Account, to be designated as "Innovative Mortgage Capital, LLC in trust for DB Structured Products, Inc. and various Mortgagors, Fixed and Adjustable Rate Mortgage Loans." All deposits in the account shall be subject to withdrawal therefrom by order signed by the Interim Servicer. You may refuse any deposit which would result in violation of the requirement that the account be fully insured as described below. This letter is submitted to you in duplicate. Please execute and return one original to us.

INNOVATIVE MORTGAGE CAPITAL, LLC
(Seller and Interim Servicer)

By:_____

Name:_____

Title:_____

Date:_____

7-1

[TPW: NYLEGAL:385167.4] 17988-00374  10/17/2005 06:46 PM

The undersigned, as Depository, hereby certifies that the above-described account has been established under Account Number _____ at the office of the Depository indicated above, and agrees to honor withdrawals on such account as provided above. The full amount deposited at any time in the account will be insured by the Federal Deposit Insurance Corporation through the Bank Insurance Fund ("BIF") or the Savings Association Insurance Fund ("SAIF").

| | |
|---|---|
| | Depository |

By:_____

Name:_____

Title:_____

Date:_____

7-2

## EXHIBIT 8

### SERVICING ADDENDUM

Subsection 11.01    Innovative to Act as Servicer.

The Interim Servicer, as independent contract servicer, shall service and administer the Mortgage Loans that the Sellers sell to the Purchaser hereunder in accordance with all applicable laws, rules and regulations, the terms of the Mortgage Note and Mortgage, the FNMA and FHLMC servicing guides and this Agreement during the Interim Servicing Period and shall have full power and authority, acting alone, to do or cause to be done any and all things in connection with such servicing and administration which the Interim Servicer may deem necessary or desirable and consistent with the terms of this Agreement.

Consistent with the terms of this Agreement, the Interim Servicer may waive, modify or vary any term of any Mortgage Loan or consent to the postponement of strict compliance with any such term or in any manner grant indulgence to any Mortgagor if in the Interim Servicer's reasonable and prudent determination such waiver, modification, postponement or indulgence is not materially adverse to the Purchaser; provided, however, that the Interim Servicer shall not permit any modification with respect to any Mortgage Loan that would change the Mortgage Interest Rate, defer or forgive the payment thereof or of any principal or interest payments, reduce the outstanding principal amount (except for actual payments of principal), make additional advances of additional principal or extend the final maturity date on such Mortgage Loan. Without limiting the generality of the foregoing, the Interim Servicer shall continue, and is hereby authorized and empowered, to execute and deliver on behalf of itself, and the Purchaser, all instruments of satisfaction or cancellation, or of partial or full release, discharge and all other comparable instruments, with respect to the Mortgage Loans and with respect to the Mortgaged Property. If reasonably required by the Interim Servicer, the Purchaser shall furnish the Interim Servicer with any powers of attorney and other documents necessary or appropriate to enable the Interim Servicer to carry out its servicing and administrative duties under this Agreement.

Notwithstanding anything in this Agreement to the contrary, in the event of a Principal Prepayment in full or in part of a Mortgage Loan, the Interim Servicer may not waive any Prepayment Charge or portion thereof required by the terms of the related Mortgage Note unless (i) the Interim Servicer determines that such waiver would maximize recovery of Liquidation Proceeds for such Mortgage Loan, taking into account the value of such Prepayment Charge and the Mortgage Loan, and the waiver of such Prepayment Charge is standard and customary in servicing similar Mortgage Loans (including the waiver of a Prepayment Charge in connection with a refinancing of the Mortgage Loan related to a default or a reasonably foreseeable default) or (ii) (A) the enforceability thereof is limited (1) by bankruptcy, insolvency, moratorium, receivership, or other similar law relating to creditors' rights or (2) due to acceleration in connection with a foreclosure or other involuntary payment, or (B) the enforceability is otherwise limited or prohibited by subsequent changes in applicable law. In no event shall the

8-1

Interim Servicer waive a Prepayment Charge in connection with a refinancing of a Mortgage ~~Loan that is not related to a default or a reasonably foreseeable default. If the Interim Servicer~~ waives or does not collect all or a portion of a Prepayment Charge relating to a Principal Prepayment in full or in part due to any action or omission of the Interim Servicer, other than as provided above, the Interim Servicer shall deposit the amount of such Prepayment Charge (or such portion thereof as had been waived for deposit) into the Custodial Account at the time of such prepayment for distribution in accordance with the terms of this Agreement.

In servicing and administering the Mortgage Loans, the Interim Servicer shall employ procedures including collection procedures and exercise the same care that it customarily employs and exercises in servicing and administering mortgage loans for its own account giving due consideration to accepted mortgage servicing practices of prudent lending institutions and the Purchaser's reliance on the Interim Servicer.

Subsection 11.02    Sub-Servicing Agreements Between the Interim Servicer and Sub-Servicers.

The Interim Servicer, as servicer, may arrange for the subservicing of any Mortgage Loan by a Sub-Servicer pursuant to a Sub-Servicing Agreement; provided that such sub-servicing arrangement and the terms of the related Sub-Servicing Agreement must provide for the servicing of such Mortgage Loans in a manner consistent with the servicing arrangements contemplated hereunder. Each Sub-Servicer shall be (i) authorized to transact business in the state or states where the related Mortgaged Properties it is to service are situated, if and to the extent required by applicable law to enable the Sub-Servicer to perform its obligations hereunder and under the Sub-Servicing Agreement and (ii) a FHLMC or FNMA approved mortgage servicer. Notwithstanding the provisions of any Sub-Servicing Agreement, any of the provisions of this Agreement relating to agreements or arrangements between the Interim Servicer or a Sub-Servicer or reference to actions taken through the Interim Servicer or otherwise, the Interim Servicer shall remain obligated and liable to the Purchaser and its successors and assigns for the servicing and administration of the Mortgage Loans in accordance with the provisions of this Agreement without diminution of such obligation or liability by virtue of such Sub-Servicing Agreements or arrangements or by virtue of indemnification from the Sub-Servicer and to the same extent and under the same terms and conditions as if the Interim Servicer alone were servicing and administering the Mortgage Loans. Every Sub-Servicing Agreement entered into by the Interim Servicer shall contain a provision giving the successor servicer the option to terminate such agreement in the event a successor servicer is appointed. All actions of each Sub-Servicer performed pursuant to the related Sub-Servicing Agreement shall be performed as an agent of the Interim Servicer with the same force and effect as if performed directly by the Interim Servicer.

For purposes of this Agreement, the Interim Servicer shall be deemed to have received any collections, recoveries or payments with respect to the Mortgage Loans that are received by a Sub-Servicer regardless of whether such payments are remitted by the Sub-Servicer to the Interim Servicer.

8-2

Subsection 11.03    <u>Successor Sub-Servicers.</u>

Any Sub-Servicing Agreement shall provide that the Interim Servicer shall be entitled to terminate any Sub-Servicing Agreement and to either itself directly service the related Mortgage Loans or enter into a Sub-Servicing Agreement with a successor Sub-Servicer which qualifies under Subsection 11.05. Any Sub-Servicing Agreement shall include the provision that such agreement may be immediately terminated by any successor to the Interim Servicer without fee, in accordance with the terms of this Agreement, in the event that the Interim Servicer (or any successor to the Interim Servicer) shall, for any reason, no longer be the servicer of the related Mortgage Loans (including termination due to an Event of Default).

Subsection 11.04    <u>No Contractual Relationship Between Sub-Servicer and Purchaser.</u>

Any Sub-Servicing Agreement and any other transactions or services relating to the Mortgage Loans involving a Sub-Servicer shall be deemed to be between the Sub-Servicer and the Interim Servicer alone and the Purchaser shall not be deemed a party thereto and shall have no claims, rights, obligations, duties or liabilities with respect to any Sub-Servicer except as set forth in Subsection 11.09.

Subsection 11.05    <u>Assumption or Termination of Sub-Servicing Agreement by Successor Servicer.</u>

In connection with the assumption of the responsibilities, duties and liabilities and of the authority, power and rights of the Interim Servicer hereunder by a successor servicer pursuant to Section 16 of this Agreement, it is understood and agreed that the Interim Servicer's rights and obligations under any Sub-Servicing Agreement then in force between the Interim Servicer and a Sub-Servicer shall be assumed simultaneously by such successor servicer without act or deed on the part of such successor servicer; provided, however, that any successor servicer may terminate the Sub-Servicer.

The Interim Servicer shall, upon the reasonable request of the Purchaser, but at its own expense, deliver to the assuming party documents and records relating to each Sub-Servicing Agreement and an accounting of amounts collected and held by it and otherwise use its best efforts to effect the orderly and efficient transfer of the Sub-Servicing Agreements to the assuming party.

The Servicing Fee payable to any such successor servicer shall be payable from payments received on the Mortgage Loans in the amount and in the manner set forth in this Agreement.

Subsection 11.06    <u>Collection of Mortgage Loan Payments.</u>

Continuously from the related Closing Date until the expiration of the Interim Servicing Period, the Interim Servicer shall proceed diligently to collect all payments due under each Mortgage Loan when the same shall become due and payable and shall, to the extent such

8-3

procedures shall be consistent with this Agreement and the terms and provisions of any related ~~Primary Insurance Policy or LPMI Policy, follow such collection procedures as it follows with~~ respect to mortgage loans comparable to the Mortgage Loans and held for its own account. Further, the Interim Servicer shall take special care in ascertaining and estimating annual ground rents, taxes, assessments, water rates, fire and hazard insurance premiums, mortgage insurance premiums, and all other charges that, as provided in the Mortgage, will become due and payable to the end that the installments payable by the Mortgagors will be sufficient to pay such charges as and when they become due and payable.

Subsection 11.07     Realization Upon Defaulted Mortgage Loans.

(a)     The Interim Servicer shall use its best efforts, consistent with the procedures that the Interim Servicer would use in servicing loans for its own account, to foreclose upon or otherwise comparably convert the ownership of such Mortgaged Properties as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments pursuant to Subsection 11.01. The Interim Servicer shall use its best efforts to realize upon defaulted Mortgage Loans in such a manner as will maximize the receipt of principal and interest by the Purchaser, taking into account, among other things, the timing of foreclosure proceedings. The foregoing is subject to the provisions that, in any case in which Mortgaged Property shall have suffered damage, the Interim Servicer shall not be required to expend its own funds toward the restoration of such property in excess of $2,000 unless it shall determine in its discretion (i) that such restoration will increase the proceeds of liquidation of the related Mortgage Loan to Purchaser after reimbursement to itself for such expenses, and (ii) that such expenses will be recoverable by the Interim Servicer through Insurance Proceeds or Liquidation Proceeds from the related Mortgaged Property, as contemplated in Subsection 11.09. In the event that any payment due under any Mortgage Loan is not paid when the same becomes due and payable, or in the event the Mortgagor fails to perform any other covenant or obligation under the Mortgage Loan and such failure continues beyond any applicable grace period, the Interim Servicer shall take such action as it shall deem to be in the best interest of the Purchaser. In the event that any payment due under any Mortgage Loan remains delinquent for a period of 90 days or more, the Interim Servicer shall commence foreclosure proceedings, provided that prior to commencing foreclosure proceedings, the Interim Servicer shall notify the Purchaser in writing of the Interim Servicer's intention to do so, and the Interim Servicer shall not commence foreclosure proceedings if the Purchaser objects to such action within ten (10) Business Days of receiving such notice. The Interim Servicer shall notify the Purchaser in writing of the commencement of foreclosure proceedings. In such connection, the Interim Servicer shall be responsible for all costs and expenses incurred by it in any such proceedings; provided, however, that it shall be entitled to reimbursement thereof from the related Mortgaged Property, as contemplated in Subsection 11.09.

(b)     Notwithstanding the foregoing provisions of this Subsection 11.07, with respect to any Mortgage Loan as to which the Interim Servicer has received actual notice of, or has actual knowledge of, the presence of any toxic or hazardous substance on the related Mortgaged Property the Interim Servicer shall not either (i) obtain title to such Mortgaged Property as a

8-4

result of or in lieu of foreclosure or otherwise, or (ii) otherwise acquire possession of, or take any other action, with respect to, such Mortgaged Property if, as a result of any such action, the Purchaser would be considered to hold title to, to be a mortgagee-in-possession of, or to be an owner or operator of such Mortgaged Property within the meaning of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time, or any comparable law, unless the Interim Servicer has also previously determined, based on its reasonable judgment and a prudent report prepared by a Person who regularly conducts environmental audits using customary industry standards, that:

    (1)    such Mortgaged Property is in compliance with applicable environmental laws or, if not, that it would be in the best economic interest of the Purchaser to take such actions as are necessary to bring the Mortgaged Property into compliance therewith; and

    (2)    there are no circumstances present at such Mortgaged Property relating to the use, management or disposal of any hazardous substances, hazardous materials, hazardous wastes, or petroleum-based materials for which investigation, testing, monitoring, containment, clean-up or remediation could be required under any federal, state or local law or regulation, or that if any such materials are present for which such action could be required, that it would be in the best economic interest of the Purchaser to take such actions with respect to the affected Mortgaged Property.

    The cost of the environmental audit report contemplated by this Subsection 11.07 shall be advanced by the Interim Servicer, subject to the Interim Servicer's right to be reimbursed therefor from the Custodial Account as provided in Subsection 11.09(v).

    If the Interim Servicer determines, as described above, that it is in the best economic interest of the Purchaser to take such actions as are necessary to bring any such Mortgaged Property into compliance with applicable environmental laws, or to take such action with respect to the containment, clean-up or remediation of hazardous substances, hazardous materials, hazardous wastes, or petroleum-based materials affecting any such Mortgaged Property, then the Interim Servicer shall take such action as it deems to be in the best economic interest of the Purchaser. The cost of any such compliance, containment, cleanup or remediation shall be advanced by the Interim Servicer, subject to the Interim Servicer's right to be reimbursed therefor from the Custodial Account as provided in Subsection 11.09(v).

    (c)    Proceeds received in connection with any Final Recovery Determination, as well as any recovery resulting from a partial collection of Insurance Proceeds or Liquidation Proceeds in respect of any Mortgage Loan, will be applied in the following order of priority: first, to reimburse the Interim Servicer for any related unreimbursed Servicing Advances, pursuant to Subsections 11.09(ii) and (v); second, to accrued and unpaid interest on the Mortgage Loan, to the date of the Final Recovery Determination, or to the Due Date prior to the Distribution Date on which such amounts are to be distributed if not in connection with a Final Recovery

8-5

Determination; and third, as a recovery of principal of the Mortgage Loan. If the amount of the recovery so allocated to interest is less than the full amount of accrued and unpaid interest due on such Mortgage Loan, the amount of such recovery will be allocated by the Interim Servicer as follows: first, to unpaid Servicing Fees; and second, to the balance of the interest then due and owing. The portion of the recovery so allocated to unpaid Servicing Fees shall be reimbursed to the Interim Servicer pursuant to Subsection 11.09(iii).

Subsection 11.08    Establishment of Custodial Accounts; Deposits in Custodial Accounts.

The Interim Servicer shall segregate and hold all funds collected and received pursuant to each Mortgage Loan separate and apart from any of its own funds and general assets and shall establish and maintain one or more Custodial Accounts, in the form of time deposit or demand accounts. The creation of any Custodial Account shall be evidenced by a Custodial Account Letter Agreement in the form of Exhibit 6.

The Interim Servicer shall deposit in the related Custodial Account on a daily basis, and retain therein the following payments and collections received by it subsequent to the Cut-off Date, or received by it prior to the Cut-off Date but allocable to a period subsequent thereto, other than in respect of principal and interest on the Mortgage Loans due on or before the Cut-off Date:

(i)    all payments on account of principal on the Mortgage Loans;

(ii)    all payments on account of interest on the Mortgage Loans, including all Prepayment Charges;

(iii)    all Liquidation Proceeds;

(iv)    all Insurance Proceeds including amounts required to be deposited pursuant to Subsections 11.14 and 11.15, other than proceeds to be held in the Escrow Account and applied to the restoration or repair of the Mortgaged Property or released to the Mortgagor in accordance with the Interim Servicer's normal servicing procedures, the loan documents or applicable law;

(v)    all Condemnation Proceeds affecting any Mortgaged Property which are not released to the Mortgagor in accordance with the Interim Servicer's normal servicing procedures, the loan documents or applicable law;

(vi)    all proceeds of any Mortgage Loan repurchased in accordance with Subsections 7.03 and 7.04 and all amounts required to be deposited by the Interim Servicer in connection with shortfalls in principal amount of Qualified Substitute Mortgage Loans pursuant to Subsection 7.03;

8-6

(vii)    any amounts required to be deposited by the Interim Servicer pursuant to Subsection 11.15 in connection with the deductible clause in any blanket hazard insurance policy. Such deposit shall be made from the Interim Servicer's own funds, without reimbursement therefor;

(viii)    any amounts required to be deposited by the Interim Servicer in connection with any REO Property pursuant to Subsection 11.17; and

(ix)    any amounts required to be deposited in the Custodial Account pursuant to Subsections 11.23 or 11.24.

The foregoing requirements for deposit in the Custodial Account shall be exclusive, it being understood and agreed that, without limiting the generality of the foregoing, payments in the nature of late payment charges and assumption fees, to the extent permitted by Subsection 11.25, need not be deposited by the Interim Servicer in the Custodial Account. Such Custodial Account shall be an Eligible Account. Any interest or earnings on funds deposited in the Custodial Account by the depository institution shall accrue to the benefit of the Interim Servicer and the Interim Servicer shall be entitled to retain and withdraw such interest from the related Custodial Account pursuant to Subsection 11.09(iii). The Interim Servicer shall give notice to the Purchaser of the location of the Custodial Account when established and prior to any change thereof.

If the balance on deposit in the Custodial Account exceeds $75,000 as of the commencement of business on any Business Day and the Custodial Account constitutes an Eligible Account solely pursuant to clause (ii) of the definition of Eligible Account, the Interim Servicer shall, on or before twelve o'clock noon Eastern time on such Business Day, withdraw from the related Custodial Account any and all amounts payable to the Purchaser and remit such amounts to the Purchaser by wire transfer of immediately available funds.

Subsection 11.09    Permitted Withdrawals From the Custodial Account.

The Interim Servicer may, from time to time, withdraw from the related Custodial Account for the following purposes:

(i)    to make distributions to the Purchaser in the amounts and in the manner provided for in Subsection 11.18;

(ii)    to reimburse itself for unreimbursed Servicing Advances, the Interim Servicer's right to reimburse itself pursuant to this subclause (ii) with respect to any Mortgage Loan being limited to related Liquidation Proceeds, Condemnation Proceeds, Insurance Proceeds and such other amounts as may be collected by the Interim Servicer from the Mortgagor or otherwise relating to the Mortgage Loan, it being understood that, in the case of such reimbursement, the Interim Servicer's right thereto shall be prior to the rights of the Purchaser, except that, where either Seller is required to repurchase a Mortgage Loan, pursuant to

8-7

Subsection 7.03, the Interim Servicer's right to such reimbursement shall be subsequent to the ~~payment to the Purchaser of the Repurchase Price pursuant to Subsection 7.03 and all other~~ amounts required to be paid to the Purchaser with respect to such Mortgage Loans;

      (iii)    to pay to itself pursuant to Subsection 11.25 as servicing compensation (a) any interest earned on funds in the Custodial Account (all such interest to be withdrawn monthly not later than each Distribution Date), and (b) the Servicing Fee from that portion of any payment or recovery as to interest on a particular Mortgage Loan;

      (iv)    to pay to itself with respect to each Mortgage Loan that has been repurchased pursuant to Subsection 7.03 all amounts received thereon and not distributed as of the date on which the related Repurchase Price is determined;

      (v)    to pay, or to reimburse the Interim Servicer for advances in respect of, expenses incurred in connection with any Mortgage Loan pursuant to Subsection 11.07(b), but only to the extent of amounts received in respect of the Mortgage Loans to which such expense is attributable;

      (vi)    to clear and terminate the Custodial Account on the termination of this Agreement.

      The Interim Servicer shall keep and maintain separate accounting, on a Mortgage Loan by Mortgage Loan basis, for the purpose of justifying any withdrawal from the Custodial Account pursuant to such subclauses (ii) - (v) above.

      Subsection 11.10    Establishment of Escrow Accounts; Deposits in Escrow Accounts.

      The Interim Servicer shall segregate and hold all funds collected and received pursuant to each Mortgage Loan which constitute Escrow Payments separate and apart from any of its own funds and general assets and shall establish and maintain one or more Escrow Accounts, in the form of time deposit or demand accounts. The creation of any Escrow Account shall be evidenced by an Escrow Account Letter Agreement in the form of Exhibit 7.

      The Interim Servicer shall deposit in the Escrow Account or Accounts on a daily basis, and retain therein, (i) all Escrow Payments collected on account of the Mortgage Loans, for the purpose of effecting timely payment of any such items as required under the terms of this Agreement, and (ii) all Insurance Proceeds which are to be applied to the restoration or repair of any Mortgaged Property. The Interim Servicer shall make withdrawals therefrom only to effect such payments as are required under this Agreement, and for such other purposes as shall be as set forth or in accordance with Subsection 11.12. The Interim Servicer shall be entitled to retain any interest paid on funds deposited in the related Escrow Account by the depository institution other than interest on escrowed funds required by law to be paid to the Mortgagor and, to the extent required by law, the Interim Servicer shall pay interest on escrowed funds to the

Mortgagor notwithstanding that the Escrow Account is non-interest bearing or that interest paid thereon is insufficient for such purposes.

Subsection 11.11    Permitted Withdrawals From Escrow Account.

Withdrawals from the related Escrow Account may be made by the Interim Servicer (i) to effect timely payments of ground rents, taxes, assessments, water rates, hazard insurance premiums, Primary Insurance Policy premiums, if applicable, and comparable items, (ii) to reimburse the Interim Servicer for any Servicing Advance made by the Interim Servicer with respect to a related Mortgage Loan but only from amounts received on the related Mortgage Loan which represent late payments or collections of Escrow Payments thereunder, (iii) to refund to the Mortgagor any funds as may be determined to be overages, (iv) for transfer to the related Custodial Account in accordance with the terms of this Agreement, (v) for application to restoration or repair of the Mortgaged Property, (vi) to pay to the Interim Servicer, or to the Mortgagor to the extent required by law, any interest paid on the funds deposited in the Escrow Account, or (vii) to clear and terminate the Escrow Account on the termination of this Agreement.

Subsection 11.12    Payment of Taxes, Insurance and Other Charges; Maintenance of Primary Insurance Policies and LPMI Policies; Collections Thereunder.

With respect to each Mortgage Loan, the Interim Servicer shall maintain accurate records reflecting the status of ground rents, taxes, assessments, water rates and other charges which are or may become a lien upon the Mortgaged Property and the status of Primary Insurance Policy and LPMI Policy premiums and fire and hazard insurance coverage and shall obtain, from time to time, all bills for the payment of such charges, including insurance renewal premiums and shall effect payment thereof prior to the applicable penalty or termination date and at a time appropriate for securing maximum discounts allowable, employing for such purpose deposits of the Mortgagor in the related Escrow Account which shall have been estimated and accumulated by the Interim Servicer in amounts sufficient for such purposes, as allowed under the terms of the Mortgage and applicable law. To the extent that the Mortgage does not provide for Escrow Payments, the Interim Servicer shall determine that any such payments are made by the Mortgagor at the time they first become due. The Interim Servicer assumes full responsibility for the timely payment of all such bills and shall effect timely payments of all such bills irrespective of the Mortgagor's faithful performance in the payment of same or the making of the Escrow Payments and shall make advances from its own funds to effect such payments.

The Interim Servicer shall maintain in full force and effect, a Primary Insurance Policy, issued by a Qualified Insurer, with respect to each Mortgage Loan for which such coverage is required. Such coverage shall be maintained until the Loan-to-Value Ratio of the related Mortgage Loan is reduced to that amount for which FNMA no longer requires such insurance to be maintained. The Interim Servicer will not cancel or refuse to renew any Primary Insurance Policy in effect on the related Closing Date that is required to be kept in force under this

8-9

Agreement unless a replacement Primary Insurance Policy or LPMI Policy for such cancelled or non- renewed policy is obtained from and maintained with a Qualified Insurer. The Interim Servicer shall not take any action which would result in non-coverage under any applicable Primary Insurance Policy or LPMI Policy of any loss which, but for the actions of the Interim Servicer, would have been covered thereunder. In connection with any assumption or substitution agreement entered into or to be entered into pursuant to Subsection 11.23, the Interim Servicer shall promptly notify the insurer under the related Primary Insurance Policy or LPMI Policy, if any, of such assumption or substitution of liability in accordance with the terms of such policy and shall take all actions which may be required by such insurer as a condition to the continuation of coverage under the Primary Insurance Policy or LPMI Policy. If such Primary Insurance Policy is terminated as a result of such assumption or substitution of liability, the Interim Servicer shall obtain a replacement Primary Insurance Policy as provided above.

In connection with its activities as servicer, the Interim Servicer agrees to prepare and present, on behalf of itself, and the Purchaser, claims to the insurer under any Primary Insurance Policy or LPMI Policy in a timely fashion in accordance with the terms of such policies and, in this regard, to take such action as shall be necessary to permit recovery under any Primary Insurance Policy or LPMI Policy respecting a defaulted Mortgage Loan. Pursuant to Subsection 11.08, any amounts collected by the Interim Servicer under any Primary Insurance Policy or LPMI Policy shall be deposited in the related Custodial Account, subject to withdrawal pursuant to Subsection 11.09.

Subsection 11.13    Transfer of Accounts.

The Interim Servicer may transfer the related Custodial Account or the related Escrow Account to a different depository institution from time to time. Such transfer shall be made only upon obtaining the consent of the Purchaser, which consent shall not be unreasonably withheld. In any case, the Custodial Account and Escrow Account shall be Eligible Accounts.

Subsection 11.14    Maintenance of Hazard Insurance.

The Interim Servicer shall cause to be maintained for each Mortgage Loan fire and hazard insurance with extended coverage as is customary in the area where the Mortgaged Property is located in an amount which is at least equal to the lesser of (i) the amount necessary to fully compensate for any damage or loss to the improvements which are a part of such property on a replacement cost basis or (ii) the outstanding principal balance of the Mortgage Loan (plus, if the Mortgage Loan is an Option ARM Mortgage Loan which provides for Negative Amortization, the maximum amount of Negative Amortization in accordance with the Mortgage), in each case in an amount not less than such amount as is necessary to prevent the Mortgagor and/or the Mortgagee from becoming a co-insurer. If the Mortgaged Property is in an area identified on a Flood Hazard Boundary Map or Flood Insurance Rate Map issued by the Flood Emergency Management Agency as having special flood hazards and such flood insurance has been made available, the Interim Servicer will cause to be maintained a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance

8-10

Administration with a generally acceptable insurance carrier, in an amount representing coverage not less than the greater of (i) the outstanding principal balance of the Mortgage Loan (plus, if the Mortgage Loan is an Option ARM Mortgage Loan which provides for Negative Amortization, the maximum amount of Negative Amortization in accordance with the Mortgage), (ii) the amount necessary to fully compensate for any damage or loss to the improvements which are a part of such property on a replacement cost basis or (iii) the maximum amount of insurance which is available under the National Flood Insurance Act of 1968 or the Flood Disaster Protection Act of 1973, as amended. The Interim Servicer also shall maintain on any REO Property, fire and hazard insurance with extended coverage in an amount which is at least equal to the lesser of (i) the maximum insurable value of the improvements which are a part of such property and (ii) the outstanding principal balance of the related Mortgage Loan (including any cumulative related Negative Amortization) at the time it became an REO Property plus accrued interest at the Mortgage Interest Rate and related Servicing Advances, liability insurance and, flood insurance in an amount which is at least equal to the greater of (i) the outstanding principal balance of the Mortgage Loan, (ii) the amount necessary to fully compensate for any damage or loss to the improvements which are part of such property on a replacement cost basis or (iii) the maximum amount of insurance which is available under the National Flood Insurance Act of 1968 or the Flood Disaster Protection Act of 1973, as amended, flood insurance in an amount as provided above. Pursuant to Subsection 11.08, any amounts collected by the Interim Servicer under any such policies other than amounts to be deposited in the Escrow Account and applied to the restoration or repair of the Mortgaged Property or REO Property, or released to the Mortgagor in accordance with the Interim Servicer's normal servicing procedures, shall be deposited in the related Custodial Account, subject to withdrawal pursuant to Subsection 11.09. Any cost incurred by the Interim Servicer in maintaining any such insurance shall not, for the purpose of calculating distributions to the Purchaser, be added to the unpaid principal balance of the related Mortgage Loan, notwithstanding that the terms of such Mortgage Loan so permit. It is understood and agreed that no earthquake or other additional insurance need be required by the Interim Servicer of the Mortgagor or maintained on property acquired in respect of the Mortgage Loan, other than pursuant to such applicable laws and regulations as shall at any time be in force and as shall require such additional insurance. All such policies shall be endorsed with standard mortgagee clauses with loss payable to the Interim Servicer, or upon request to the Purchaser, and shall provide for at least thirty days prior written notice of any cancellation, reduction in the amount of, or material change in, coverage to the Interim Servicer. The Interim Servicer shall not interfere with the Mortgagor's freedom of choice in selecting either his insurance carrier or agent, provided, however, that the Interim Servicer shall not accept any such insurance policies from insurance companies unless such companies currently reflect a General Policy Rating of A:VI or better in Best's Key Rating Guide and are licensed to do business in the state wherein the property subject to the policy is located.

Subsection 11.15    Maintenance of Mortgage Impairment Insurance Policy.

In the event that the Interim Servicer shall obtain and maintain a mortgage impairment or blanket policy issued by an issuer that has a Best rating of A:VI insuring against hazard losses on

8-11

all Mortgaged Properties securing the Mortgage Loans, then, to the extent such policy provides ~~coverage in an amount equal to the amount required pursuant to Subsection 11.14 and otherwise~~ complies with all other requirements of Subsection 11.14, the Interim Servicer shall conclusively be deemed to have satisfied its obligations as set forth in Subsection 11.14, it being understood and agreed that such policy may contain a deductible clause, in which case the Interim Servicer shall, in the event that there shall not have been maintained on the related Mortgaged Property or REO Property a policy complying with Subsection 11.14, and there shall have been one or more losses which would have been covered by such policy, deposit in the related Custodial Account the amount not otherwise payable under the blanket policy because of such deductible clause. In connection with its activities as servicer of the Mortgage Loans, the Interim Servicer agrees to prepare and present, on behalf of the Purchaser, claims under any such blanket policy in a timely fashion in accordance with the terms of such policy. Upon request of the Purchaser, the Interim Servicer shall cause to be delivered to the Purchaser a certified true copy of such policy and a statement from the insurer thereunder that such policy shall in no event be terminated or materially modified without thirty days prior written notice to the Purchaser.

Subsection 11.16        Fidelity Bond, Errors and Omissions Insurance.

The Interim Servicer shall maintain, at its own expense, a blanket fidelity bond and an errors and omissions insurance policy, with broad coverage with responsible companies that would meet the requirements of FNMA or FHLMC on all officers, employees or other persons acting in any capacity with regard to the Mortgage Loans to handle funds, money, documents and papers relating to the Mortgage Loans. The fidelity bond and errors and omissions insurance shall be in the form of the Mortgage Banker's Blanket Bond and shall protect and insure the Interim Servicer against losses, including forgery, theft, embezzlement, fraud, errors and omissions and negligent acts of such persons. Such fidelity bond shall also protect and insure the Interim Servicer against losses in connection with the failure to maintain any insurance policies required pursuant to this Agreement and the release or satisfaction of a Mortgage Loan without having obtained payment in full of the indebtedness secured thereby. No provision of this Subsection 11.16 requiring the fidelity bond and errors and omissions insurance shall diminish or relieve the Interim Servicer from its duties and obligations as set forth in this Agreement. The minimum coverage under any such bond and insurance policy shall be at least equal to the corresponding amounts required by FNMA in the FNMA Servicing Guide or by FHLMC in the FHLMC Seller's and Servicers' Guide. The Interim Servicer shall deliver to the Purchaser a certified true copy of the fidelity bond and insurance policy and a statement from the surety and the insurer that such fidelity bond or insurance policy shall in no event be terminated or materially modified without thirty days' prior written notice to the Purchaser.

Subsection 11.17        Title, Management and Disposition of REO Property.

In the event that title to the Mortgaged Property is acquired in foreclosure or by deed in lieu of foreclosure, the deed or certificate of sale shall be taken in the name of the person designated by the Purchaser, or in the event such person is not authorized or permitted to hold title to real property in the state where the REO Property is located, or would be adversely

8-12

affected under the "doing business" or tax laws of such state by so holding title, the deed or ~~certificate of sale shall be taken in the name of such Person or Persons as shall be consistent with~~ an opinion of counsel obtained by the Interim Servicer from an attorney duly licensed to practice law in the state where the REO Property is located. Any Person or Persons holding such title other than the Purchaser shall acknowledge in writing that such title is being held as nominee for the benefit of the Purchaser.

The Interim Servicer shall either itself or through an agent selected by the Interim Servicer, manage, conserve, protect and operate each REO Property (and may temporarily rent the same) in the same manner that it manages, conserves, protects and operates other foreclosed property for its own account, and in the same manner that similar property in the same locality as the REO Property is managed. If a REMIC election is or is to be made with respect to the arrangement under which the Mortgage Loans and any REO Property are held, the Interim Servicer shall manage, conserve, protect and operate each REO Property in a manner which does not cause such REO Property to fail to qualify as "foreclosure property" within the meaning of Section 860G(a)(8) of the Code or result in the receipt by such REMIC of any "income from non permitted assets" within the meaning of Section 860F(a)(2)(B) of the Code or any "net income from foreclosure property" within the meaning of Section 860G(c)(2) of the Code. The Interim Servicer shall cause each REO Property to be inspected promptly upon the acquisition of title thereto and shall cause each REO Property to be inspected at least annually thereafter. The Interim Servicer shall make or cause to be made a written report of each such inspection. Such reports shall be retained in the Mortgage File and copies thereof shall be forwarded by the Interim Servicer to the Purchaser. The Interim Servicer shall use its best efforts to dispose of the REO Property as soon as possible and shall sell such REO Property in any event within one year after title has been taken to such REO Property, unless the Interim Servicer determines, and gives appropriate notice to the Purchaser, that a longer period is necessary for the orderly liquidation of such REO Property. If a period longer than one year is necessary to sell any REO property, (i) the Interim Servicer shall report monthly to the Purchaser as to the progress being made in selling such REO Property and (ii) if, with the written consent of the Purchaser, a purchase money mortgage is taken in connection with such sale, such purchase money mortgage shall name the Interim Servicer as mortgagee, and a separate servicing agreement between the Interim Servicer and the Purchaser shall be entered into with respect to such purchase money mortgage. Notwithstanding the foregoing, if a REMIC election is made with respect to the arrangement under which the Mortgage Loans and the REO Property are held, such REO Property shall be disposed of within three years or such other period as may be permitted under Section 860G(a)(8) of the Code.

With respect to each REO Property, the Interim Servicer shall segregate and hold all funds collected and received in connection with the operation of the REO Property separate and apart from its own funds or general assets and shall establish and maintain a separate REO Account for each REO Property in the form of a non interest bearing demand account, unless an Opinion of Counsel is obtained by the Interim Servicer to the effect that the classification as a grantor trust or REMIC for federal income tax purposes of the arrangement under which the

8-13

Mortgage Loans and the REO Property is held will not be adversely affected by holding such funds in another manner. Each REO Account shall be established with the Interim Servicer or, with the prior consent of the Purchaser, with a commercial bank, a mutual savings bank or a savings association. The creation of any REO Account shall be evidenced by a letter agreement substantially in the form of the Custodial Account Letter Agreement attached as Exhibit 6 hereto. An original of such letter agreement shall be furnished to any Purchaser upon request.

The Interim Servicer shall deposit or cause to be deposited, on a daily basis in each REO Account all revenues received with respect to the related REO Property and shall withdraw therefrom funds necessary for the proper operation, management and maintenance of the REO Property, including the cost of maintaining any hazard insurance pursuant to Subsection 11.14 hereof and the fees of any managing agent acting on behalf of the Interim Servicer. The Interim Servicer shall not be entitled to retain interest paid or other earnings, if any, on funds deposited in such REO Account. On or before each Determination Date, the Interim Servicer shall withdraw from each REO Account and deposit into the Custodial Account the net income from the REO Property on deposit in the REO Account.

The Interim Servicer shall furnish to the Purchaser on each Distribution Date, an operating statement for each REO Property covering the operation of each REO Property for the previous month. Such operating statement shall be accompanied by such other information as the Purchaser shall reasonably request.

Each REO Disposition shall be carried out by the Interim Servicer at such price and upon such terms and conditions as the Interim Servicer deems to be in the best interest of the Purchaser only with the prior written consent of the Purchaser. If as of the date title to any REO Property was acquired by the Interim Servicer there were outstanding unreimbursed Servicing Advances with respect to the REO Property, the Interim Servicer, upon an REO Disposition of such REO Property, shall be entitled to reimbursement for any related unreimbursed Servicing Advances from proceeds received in connection with such REO Disposition. The proceeds from the REO Disposition, net of any payment to the Interim Servicer as provided above, shall be deposited in the REO Account and shall be transferred to the Custodial Account on the Determination Date in the month following receipt thereof for distribution on the succeeding Distribution Date in accordance with Subsection 11.18.

Subsection 11.18    Distributions.

On each Distribution Date, the Interim Servicer shall distribute to the Purchaser all amounts credited to the related Custodial Account as of the close of business on the preceding Determination Date, net of charges against or withdrawals from the related Custodial Account pursuant to Subsection 11.09.

All distributions made to the Purchaser on each Distribution Date will be made to the Purchaser of record on the preceding Record Date, and shall be based on the Mortgage Loans

8-14

owned and held by the Purchaser, and shall be made by wire transfer of immediately available
~~funds in accordance with the following wire transfer instructions:~~

|  |  |
|---|---|
| DB STRUCTURED PRODUCTS | |
| BANK: | BANK OF NEW YORK |
| ABA: | 021000018 |
| ACCT #: | GLA/111569 |
| ACCT NAME: | DPX |
| ATTN: | Rob Barreto |
| RE: | Innovative Mortgage Capital, LLC |

With respect to any remittance received by the Purchaser on or after the first Business
Day following the Business Day on which such payment was due, the Interim Servicer shall pay
to the Purchaser interest on any such late payment at an annual rate equal to the rate of interest as
is publicly announced from time to time at its principal office by JPMorgan Chase Bank, New
York, New York, as its prime lending rate, adjusted as of the date of each change, plus three
percentage points, but in no event greater than the maximum amount permitted by applicable
law. Such interest shall be paid by the Interim Servicer to the Purchaser on the date such late
payment is made and shall cover the period commencing with the day following such first
Business Day and ending with the Business Day on which such payment is made, both inclusive.
Such interest shall be remitted along with such late payment. The payment by the Interim
Servicer of any such interest shall not be deemed an extension of time for payment or a waiver
by the Purchaser of any Event of Default by the Interim Servicer.

Subsection 11.19     Remittance Reports.

No later than the fifth Business Day of each month, the Interim Servicer shall furnish to
the Purchaser or its designee an electronic (which shall be provided in Excel format and
delivered via email to DBWholeLoanOps@List.DB.com) and a hard copy of the monthly data in
the form of report attached hereto as Exhibit 11. No later than three Business Days following
each Determination Date, the Interim Servicer shall deliver to the Purchaser or its designee by
telecopy (or by such other means as the Interim Servicer and the Purchaser may agree from time
to time) an electronic and a hard copy of the determination data with respect to the related
Distribution Date, together with such other information with respect to the Mortgage Loans as
the Purchaser may reasonably require to allocate distributions made pursuant to this Agreement
and provide appropriate statements with respect to such distributions.  To the extent that the
Mortgage Loans are the subject of a Pass-Through Transfer, the computer tape must include all
information known or available to the Interim Servicer that is necessary in order to provide the
distribution and pool performance information as required under Item 1121 of Regulation AB as
determined by Purchaser in its sole discretion. The Interim Servicer shall modify the computer
tape format as requested by the Purchaser from time to time in order to comply with the
preceding sentence.  On the same date, the Interim Servicer shall forward to the Purchaser by
overnight mail a computer readable disk containing the information set forth in the remittance
report with respect to the related Distribution Date.

[TPW: NYLEGAL:385167.4] 17988-00374  10/17/2005 06:46 PM

Subsection 11.20    <u>Statements to the Purchaser.</u>

Not later than fifteen days after each Distribution Date, the Interim Servicer shall forward to the Purchaser or its designee a statement prepared by the Interim Servicer setting forth the status of the Custodial Account as of the close of business on such Distribution Date and showing, for the period covered by such statement, the aggregate amount of deposits into and withdrawals from the Custodial Account of each category of deposit specified in Subsection 11.08 and each category of withdrawal specified in Subsection 11.09.

In addition, not more than sixty days after the end of each calendar year, the Interim Servicer shall furnish to each Person who was the Purchaser at any time during such calendar year, (i) as to the aggregate of remittances for the applicable portion of such year, an annual statement in accordance with the requirements of applicable federal income tax law, and (ii) listing of the principal balances of the Mortgage Loans outstanding at the end of such calendar year.

The Interim Servicer shall prepare and file any and all tax returns, information statements or other  filings required to be delivered to any governmental taxing authority or to any Purchaser pursuant to any applicable law with respect to the Mortgage Loans and the transactions contemplated hereby. In addition, the Interim Servicer shall provide the Purchaser with such information concerning the Mortgage Loans as is necessary for the Purchaser to prepare its federal income tax return as any Purchaser may reasonably request from time to time.

Subsection 11.21    <u>Real Estate Owned Reports.</u>

Together with the statement furnished pursuant to Subsection 11.17, with respect to any REO Property, the Interim Servicer shall furnish to the Purchaser a statement covering the Interim Servicer's efforts in connection with the sale of such REO Property and any rental of such REO Property incidental to the sale thereof for the previous month, together with the operating statement.  Such statement shall be accompanied by such other information as the Purchaser shall reasonably request.

Subsection 11.22    <u>Liquidation Reports.</u>

Upon the foreclosure sale of any Mortgaged Property or the acquisition thereof pursuant to a deed in lieu of foreclosure, the Interim Servicer shall submit to the Purchaser a liquidation report with respect to such Mortgaged Property.

Subsection 11.23    <u>Assumption Agreements.</u>

The Interim Servicer shall, to the extent it has knowledge of any conveyance or prospective conveyance by any Mortgagor of the Mortgaged Property (whether by absolute conveyance or by contract of sale, and whether or not the Mortgagor remains or is to remain liable under the Mortgage Note and/or the Mortgage), exercise its rights to accelerate the

[TPW: NYLEGAL:385167.4] 17988-00374  10/17/2005 06:46 PM

maturity of such Mortgage Loan under any "due-on-sale" clause applicable thereto; provided, however, that the Interim Servicer shall not exercise any such rights if prohibited by law from doing so or if the exercise of such rights would impair or threaten to impair any recovery under the related Primary Insurance Policy or LPMI Policy, if any. If the Interim Servicer reasonably believes it is unable under applicable law to enforce such "due-on-sale" clause, the Interim Servicer shall enter into an assumption agreement with the person to whom the Mortgaged Property has been conveyed or is proposed to be conveyed, pursuant to which such person becomes liable under the Mortgage Note and, to the extent permitted by applicable state law, the Mortgagor remains liable thereon. Where an assumption is allowed pursuant to this Subsection 11.23, the Interim Servicer, with the prior written consent of the insurer under the Primary Insurance Policy or LPMI Policy, if any, is authorized to enter into a substitution of liability agreement with the person to whom the Mortgaged Property has been conveyed or is proposed to be conveyed pursuant to which the original Mortgagor is released from liability and such Person is substituted as Mortgagor and becomes liable under the related Mortgage Note. Any such substitution of liability agreement shall be in lieu of an assumption agreement.

In connection with any such assumption or substitution of liability, the Interim Servicer shall follow the underwriting practices and procedures of prudent mortgage lenders in the state in which the related Mortgaged Property is located. With respect to an assumption or substitution of liability, the Mortgage Interest Rate, the amount of the Monthly Payment, and the final maturity date of such Mortgage Note may not be changed. The Interim Servicer shall notify the Purchaser that any such substitution of liability or assumption agreement has been completed by forwarding to the Purchaser the original of any such substitution of liability or assumption agreement, which document shall be added to the related Mortgage File and shall, for all purposes, be considered a part of such Mortgage File to the same extent as all other documents and instruments constituting a part thereof. Any fee collected by the Interim Servicer for entering into an assumption or substitution of liability agreement in excess of 1% of the outstanding principal balance of the Mortgage Loan shall be deposited in the Custodial Account pursuant to Subsection 11.08.

Notwithstanding the foregoing paragraphs of this Subsection or any other provision of this Agreement, the Interim Servicer shall not be deemed to be in default, breach or any other violation of its obligations hereunder by reason of any assumption of a Mortgage Loan by operation of law or any assumption which the Interim Servicer may be restricted by law from preventing, for any reason whatsoever. For purposes of this Subsection 11.23, the term "assumption" is deemed to also include a sale of the Mortgaged Property subject to the Mortgage that is not accompanied by an assumption or substitution of liability agreement.

Subsection 11.24     Satisfaction of Mortgages and Release of Mortgage Files.

Upon the payment in full of any Mortgage Loan, or the receipt by the Interim Servicer of a notification that payment in full will be escrowed in a manner customary for such purposes, the Interim Servicer will immediately notify the Purchaser by a certification of a servicing officer of the Interim Servicer (a "Servicing Officer"), which certification shall include a statement to the

8-17

effect that all amounts received or to be received in connection with such payment which are required to be deposited in the Custodial Account pursuant to Subsection 11.08 have been or will be so deposited, and shall request execution of any document necessary to satisfy the Mortgage Loan and delivery to it of the portion of the Mortgage File held by the Purchaser or the Purchaser's designee. Upon receipt of such certification and request, the Purchaser, shall promptly release the related mortgage documents to the Interim Servicer and the Interim Servicer shall prepare and process any satisfaction or release. No expense incurred in connection with any instrument of satisfaction or deed of reconveyance shall be chargeable to the Custodial Account or the Purchaser.

In the event the Interim Servicer satisfies or releases a Mortgage without having obtained payment in full of the indebtedness secured by the Mortgage or should it otherwise prejudice any right the Purchaser may have under the mortgage instruments, the Interim Servicer, upon written demand, shall remit to the Purchaser the then outstanding principal balance of the related Mortgage Loan by deposit thereof in the Custodial Account. The Interim Servicer shall maintain the fidelity bond insuring the Interim Servicer against any loss they may sustain with respect to any Mortgage Loan not satisfied in accordance with the procedures set forth herein.

From time to time and as appropriate for the servicing of the Mortgage Loan, including for this purpose collection under any Primary Insurance Policy or LPMI Policy, the Purchaser shall, upon request of the Interim Servicer and delivery to the Purchaser of a servicing receipt signed by a Servicing Officer, release the requested portion of the Mortgage File held by the Purchaser to the Interim Servicer. Such servicing receipt shall obligate the Interim Servicer to return the related Mortgage documents to the Purchaser when the need therefor by the Interim Servicer no longer exists, unless the Mortgage Loan has been liquidated and the Liquidation Proceeds relating to the Mortgage Loan have been deposited in the Custodial Account or the Mortgage File or such document has been delivered to an attorney, or to a public trustee or other public official as required by law, for purposes of initiating or pursuing legal action or other proceedings for the foreclosure of the Mortgaged Property either judicially or non-judicially, and the Interim Servicer has delivered to the Purchaser a certificate of a Servicing Officer certifying as to the name and address of the Person to which such Mortgage File or such document was delivered and the purpose or purposes of such delivery. Upon receipt of a certificate of a Servicing Officer stating that such Mortgage Loan was liquidated, the servicing receipt shall be released by the Purchaser to the Interim Servicer.

Subsection 11.25    Servicing Compensation.

As compensation for its services hereunder, the Interim Servicer shall be entitled to withdraw from the Custodial Account or to retain from interest payments on the Mortgage Loans the amounts provided for as the Interim Servicer's Servicing Fee. Additional servicing compensation in the form of assumption fees, as provided in Subsection 11.23, and late payment charges or otherwise shall be retained by the Interim Servicer to the extent not required to be deposited in the Custodial Account. The Interim Servicer shall be required to pay all expenses

[TPW: NYLEGAL:385167.4] 17988-00374  10/17/2005 06:46 PM

incurred by it in connection with its servicing activities hereunder and shall not be entitled to reimbursement therefor except as specifically provided for.

Subsection 11.26    Notification of Adjustments.

On each Adjustment Date, the Interim Servicer shall make interest rate adjustments for each Adjustable Rate Mortgage Loan in compliance with the requirements of the related Mortgage and Mortgage Note. The Interim Servicer shall execute and deliver the notices required by each Mortgage and Mortgage Note regarding interest rate adjustments. The Interim Servicer also shall provide timely notification to the Purchaser of all applicable data and information regarding such interest rate adjustments and the Interim Servicer's methods of implementing such interest rate adjustments. Upon the discovery by the Sellers or the Purchaser that the Interim Servicer has failed to adjust a Mortgage Interest Rate or a Monthly Payment pursuant to the terms of the related Mortgage Note and Mortgage, the Interim Servicer shall immediately deposit in the Custodial Account from its own funds the amount of any interest loss caused thereby without reimbursement therefor.

Subsection 11.27    Statement as to Compliance.

(a)    The Interim Servicer will deliver to the Purchaser not later than March 1 of each calendar year beginning in 200[6], an Officers' Certificate (each, an "Annual Statement of Compliance") stating, as to each signatory thereof, that (i) a review of the activities of the Interim Servicer during the preceding calendar year and of performance under this Agreement or other applicable servicing agreement has been made under such officers' supervision and (ii) to the best of such officers' knowledge, based on such review, the Interim Servicer has fulfilled all of its obligations under this Agreement or other applicable servicing agreement in all material respects throughout such year, or, if there has been a failure to fulfill any such obligation in any material respect, specifying each such failure known to such officer and the nature and status thereof. Copies of such statement shall be provided by the Purchaser to any Person identified as a prospective purchaser of the Mortgage Loans. In the event that the Interim Servicer has delegated any servicing responsibilities with respect to the Mortgage Loans to a Sub-Servicer, the Interim Servicer shall deliver an officer's certificate of the Sub-Servicer as described above as to each Sub-Servicer as and when required with respect to the Interim Servicer.

(b)    With respect to any Mortgage Loans that are the subject of a Pass-Through Transfer, by March 1 of each calendar year beginning in 200[6], an officer of the Interim Servicer shall execute and deliver an Officer's Certificate to the Purchaser, any master servicer which is master servicing loans in connection with such transaction (a "Master Servicer") and any related depositor (a "Depositor") for the benefit of each such entity and such entity's affiliates and the officers, directors and agents of any such entity and such entity's affiliates, an Officer's Certificate in the form attached hereto as Exhibit 14. In the event that the Interim Servicer has delegated any servicing responsibilities with respect to the Mortgage Loans to a Sub-Servicer, the Interim Servicer shall deliver an

8-19

officer's certificate of the Sub-Servicer as described above as to each Sub-Servicer as and
~~when required with respect to the Interim Servicer.~~

(c)    The Interim Servicer shall indemnify and hold harmless the Master Servicer, the Depositor, the Purchaser (and if this Agreement has been assigned in whole or in part by the Purchaser, any and all Persons previously acting as "Purchaser" hereunder), and their respective officers, directors, agents and affiliates, and such affiliates' officers, directors and agents (any such person, an "Indemnified Party") from and against any losses, damages, penalties, fines, forfeitures, reasonable legal fees and related costs, judgments and other costs and expenses arising out of or based upon a breach by the Interim Servicer or any of its officers, directors, agents or affiliates of its obligations under this Subsection 11.27, Subsection 11.28 or Subsection 11.29, or the negligence, bad faith or willful misconduct of the Interim Servicer in connection therewith. If the indemnification provided for herein is unavailable or insufficient to hold harmless any Indemnified Party, then the Interim Servicer agrees that it shall contribute to the amount paid or payable by the Indemnified Party as a result of the losses, claims, damages or liabilities of the Indemnified Party in such proportion as is appropriate to reflect the relative fault of the Indemnified Party on the one hand and the Interim Servicer on the other in connection with a breach of the Interim Servicer's obligations under this Subsection 11.27, Subsection 11.28 or Subsection 11.29, or the Interim Servicer's negligence, bad faith or willful misconduct in connection therewith.

Subsection 11.28    Independent Public Accountants' Servicing Report.

Not later than March 1 of each calendar year beginning in 200[6], the Interim Servicer at its expense shall cause a firm of independent public accountants (which may also render other services to the Sellers) which is a member of the American Institute of Certified Public Accountants to furnish a report (a "USAP Report") to the Purchaser or its designee to the effect that such firm has examined certain documents and records relating to the servicing of the Mortgage Loans under this Agreement or of mortgage loans under pooling and servicing agreements (including the Mortgage Loans and this Agreement) substantially similar one to another (such statement to have attached thereto a schedule setting forth the pooling and servicing agreements covered thereby) and that, on the basis of such examination conducted substantially in compliance with the Uniform Single Attestation Program for Mortgage Bankers, such firm confirms that such servicing has been conducted in compliance with such pooling and servicing agreements during the preceding calendar year, except for such significant exceptions or errors in records that, in the opinion of such firm, the Uniform Single Attestation Program for Mortgage Bankers requires it to report. Copies of such report shall be provided by the Purchaser to any Person identified as a prospective purchaser of the Mortgage Loans.

In the event that the Interim Servicer has delegated any servicing responsibilities with respect to the Mortgage Loans to a Sub-Servicer, the Interim Servicer shall provide a statement of the Sub-Servicer as described above as to each Sub-Servicer as and when required with respect to the Interim Servicer.

8-20

Notwithstanding the foregoing, the Interim Servicer's obligation to deliver a USAP ~~Report under this Subsection, as to the Interim Servicer or any Sub-Servicer, as to any calendar~~ year, beginning with the report required in March 2007, shall be satisfied if an Assessment of Compliance and Attestation Report is delivered in compliance with Subsection 11.29 for such calendar year with respect to that entity.

Subsection 11.29    Assessment of Compliance with Servicing Criteria.

With respect to any Mortgage Loans that are the subject of a Pass-Through Transfer, the Interim Servicer shall deliver to the Purchaser or its designee on or before March 1 of each calendar year beginning in 200[7], a report (an "Assessment of Compliance") reasonably satisfactory to the Purchaser regarding the Interim Servicer's assessment of compliance with the Servicing Criteria during the preceding calendar year as required by Rules 13a-18 and 15d-18 of the Exchange Act and Item 1122 of Regulation AB, which as of the date hereof, require a report by an authorized officer of the Interim Servicer that contains the following:

(a)     A statement by such officer of its responsibility for assessing compliance with the Servicing Criteria applicable to the Interim Servicer;

(b)     A statement by such officer that such officer used the Servicing Criteria to assess compliance with the Servicing Criteria applicable to the Interim Servicer;

(c)     An assessment by such officer of the Interim Servicer's compliance with the applicable Servicing Criteria for the period consisting of the preceding calendar year, including disclosure of any material instance of noncompliance with respect thereto during such period, which assessment shall be based on the activities it performs with respect to asset-backed securities transactions taken as a whole involving the Interim Servicer, that are backed by the same asset type as the Mortgage Loans;

(d)     A statement that a registered public accounting firm has issued an attestation report on the Interim Servicer's Assessment of Compliance for the period consisting of the preceding calendar year; and

(e)     A statement as to which of the Servicing Criteria, if any, are not applicable to the Interim Servicer, which statement shall be based on the activities it performs with respect to asset-backed securities transactions taken as a whole involving the Interim Servicer, that are backed by the same asset type as the Mortgage Loans.

With respect to any Mortgage Loans that are the subject of a Pass-Through Transfer, on or before March 1 of each calendar year beginning in 2007, the Interim Servicer shall furnish to the Purchaser or its designee a report (an "Attestation Report") by a registered public accounting firm that attests to, and reports on, the Assessment of Compliance made by the Interim Servicer, as required by Rules 13a-18 and 15d-18 of the Exchange Act and Item 1122(b) of Regulation

[TPW: NYLEGAL:385167.4] 17988-00374  10/17/2005 06:46 PM

AB, which Attestation Report must be made in accordance with standards for attestation reports issued or adopted by the Public Company Accounting Oversight Board.

In the event that the Interim Servicer has delegated any servicing responsibilities with respect to the Mortgage Loans to a Sub-Servicer, the Interim Servicer shall provide an Assessment of Compliance of the Sub-Servicer and accompanying Attestation Report as described above as to each Sub-Servicer as and when required with respect to the Interim Servicer.

Subsection 11.30    Access to Certain Documentation.

The Interim Servicer shall provide to the Office of Thrift Supervision, the FDIC and any other federal or state banking or insurance regulatory authority that may exercise authority over the Purchaser access to the documentation regarding the Mortgage Loans serviced by the Interim Servicer required by applicable laws and regulations. Such access shall be afforded without charge, but only upon reasonable request and during normal business hours at the offices of the Interim Servicer. In addition, access to the documentation will be provided to the Purchaser and any Person identified to the Interim Servicer by the Purchaser without charge, upon reasonable request during normal business hours at the offices of the Interim Servicer.

Subsection 11.31    Reports and Returns to be Filed by the Interim Servicer.

The Interim Servicer shall file information reports with respect to the receipt of mortgage interest received in a trade or business, reports of foreclosures and abandonments of any Mortgaged Property and information returns relating to cancellation of indebtedness income with respect to any Mortgaged Property as required by Sections 6050H, 6050J and 6050P of the Code. Such reports shall be in form and substance sufficient to meet the reporting requirements imposed by such Sections 6050H, 6050J and 6050P of the Code.

Subsection 11.32    Servicing Transfer.

At the end of the Interim Servicing Period, the Initial Purchaser, or its designee, shall assume all servicing responsibilities related to the Mortgage Loans and the Interim Servicer shall cease all servicing responsibilities related to the Mortgage Loans. During the Interim Servicing Period, the Seller shall, at its cost and expense, take such steps as may be necessary or appropriate to effectuate and evidence the transfer of the servicing of the related Mortgage Loans to the Initial Purchaser, or its designee. The Interim Servicer agrees to execute and deliver such instruments and take such actions as the Initial Purchaser, or its designee may, from time to time, reasonably request to carry out the servicing transfer.

Subsection 11.33    Superior Liens.

With respect to each Second Lien Mortgage Loan, the Interim Servicer shall, for the protection of the Purchaser's interest, file (or cause to be filed) of record a request for notice of

8-22

any action by a superior lienholder where permitted by local law and whenever applicable state law does not require that a junior lienholder be named as a party defendant in foreclosure proceedings in order to foreclose such junior lienholder's equity of redemption. The Interim Servicer shall also notify any superior lienholder in writing of the existence of the Mortgage Loan and request notification of any action (as described below) to be taken against the Mortgagor or the Mortgaged Property by the superior lienholder.

If the Interim Servicer is notified that any superior lienholder has accelerated or intends to accelerate the obligations secured by the superior lien, or has declared or intends to declare a default under the superior mortgage or the promissory note secured thereby, or has filed or intends to file an election to have the Mortgaged Property sold or foreclosed, the Interim Servicer shall take whatever actions are necessary to protect the interests of the Purchaser, and/or to preserve the security of the related Mortgage Loan, subject to any requirements applicable to real estate mortgage investment conduits pursuant to the Code. The Interim Servicer shall make a Servicing Advance of the funds necessary to cure the default or reinstate the superior lien if the Interim Servicer determines that such Servicing Advance is in the best interests of the Purchaser. The Interim Servicer shall not make such a Servicing Advance except to the extent that it determines in its reasonable good faith judgment that such advance will be recoverable from Liquidation Proceeds on the related Mortgage Loan. The Interim Servicer shall thereafter take such action as is necessary to recover the amount so advanced.

If the Mortgage relating to a Mortgage Loan had a lien senior to the Mortgage Loan on the related Mortgaged Property as of the related Cut-off Date, then the Interim Servicer, in its capacity as interim servicer, may consent to the refinancing of the prior senior lien, provided that the following requirements are met:

1.     the resulting Combined Loan-to-Value Ratio of such Mortgage Loan is no higher than the Combined Loan-to-Value Ratio prior to such refinancing; and

2.     the interest rate, or, in the case of an adjustable rate existing senior lien, the maximum interest rate, for the loan evidencing the refinanced senior lien is no more than 2.0% higher than the interest rate or the maximum interest rate, as the case may be, on the loan evidencing the existing senior lien immediately prior to the date of such refinancing; and

3.     the loan evidencing the refinanced senior lien is not subject to Negative Amortization.

Subsection 11.34      Compliance with REMIC Provisions.

If a REMIC election has been made with respect to the arrangement under which the Mortgage Loans and REO Property are held, the Interim Servicer shall not take any action, cause the REMIC to take any action or fail to take (or fail to cause to be taken) any action that, under the REMIC Provisions, if taken or not taken, as the case may be, could (i) endanger the status of the REMIC as a REMIC or (ii) result in the imposition of a tax upon the REMIC (including but not limited to the tax on "prohibited transactions" as defined in Section 860F(a)(2) of the Code

[TPW: NYLEGAL:385167.4] 17988-00374  10/17/2005 06:46 PM

and the tax on "contributions" to a REMIC set forth in Section 860G(d) of the Code) unless the ~~Interim Servicer has received an Opinion of Counsel (at the expense of the party seeking to take~~ such action) to the effect that the contemplated action will not endanger such REMIC status or result in the imposition of any such tax.

[TPW: NYLEGAL:385167.4] 17988-00374  10/17/2005 06:46 PM

## EXHIBIT 9

### FORM OF COMMITMENT LETTER

9-1

[TPW: NYLEGAL:385167.4] 17988-00374  10/17/2005 06:46 PM

## EXHIBIT 10

## MORTGAGE LOAN DOCUMENTS

With respect to each Mortgage Loan set forth on a related Mortgage Loan Schedule, the Sellers shall deliver and release to the Custodian the following documents:

1.      the original Mortgage Note bearing all intervening endorsements necessary to show a complete chain of endorsements from the original payee to the related Seller, endorsed in blank, "Pay to the order of _____, without recourse", and, if previously endorsed, signed in the name of the last endorsee by a duly qualified officer of the last endorsee. If the Mortgage Loan was acquired by the last endorsee in a merger, the endorsement must be by "[name of last endorsee], successor by merger to [name of predecessor]". If the Mortgage Loan was acquired or originated by the last endorsee while doing business under another name, the endorsement must be by "[name of last endorsee], formerly known as [previous name]";

If the related Seller uses facsimile signatures to endorse Mortgage Notes, such Seller must provide in an Officer's Certificate that the endorsement is valid and enforceable in the jurisdiction(s) in which the Mortgaged Properties are located and must retain in its corporate records the following specific documentation authorizing the use of facsimile signatures: (i) a resolution from its board of directors authorizing specific officers to use facsimile signatures; stating that facsimile signatures will be a valid and binding act on such Seller's part; and authorizing such Seller's corporate secretary to certify the validity of the resolution, the names of the officers authorized to execute documents by using facsimile signatures, and the authenticity of specimen forms of facsimile signatures; (ii) the corporate secretary's certification of the authenticity and validity of the board of directors' resolution; and (iii) a notarized "certification of facsimile signature," which includes both the facsimile and the original signatures of the signing officer(s) and each officer's certification that the facsimile is a true and correct copy of his or her original signature.

2.      in the case of a Mortgage Loan that is not a MERS Mortgage Loan, the original Assignment of Mortgage for each Mortgage Loan, in form and substance acceptable for recording. The Mortgage shall be assigned, with assignee's name left blank. If the Mortgage Loan was acquired by the last assignee in a merger, the Assignment of Mortgage must be made by "[name of last assignee], successor by merger to [name of predecessor]". If the Mortgage Loan was acquired or originated by the last assignee while doing business under another name, the Assignment of Mortgage must be by "[name of last assignee], formerly known as [previous name]";

3.      the original of any guarantee executed in connection with the Mortgage Note, if any;

10-1

4.     for each Mortgage Loan that is not a MERS Mortgage Loan, the original Mortgage with evidence of recording thereon or, if the original Mortgage with evidence of recording thereon has not been returned by the public recording office where such Mortgage has been delivered for recordation or such Mortgage has been lost or such public recording office retains the original recorded Mortgage, a photocopy of such Mortgage, together with (i) in the case of a delay caused by the public recording office, an Officer's Certificate of the title insurer insuring the Mortgage stating that such Mortgage has been delivered to the appropriate public recording office for recordation and that the original recorded Mortgage or a copy of such Mortgage certified by such public recording office to be a true and complete copy of the original recorded Mortgage will be promptly delivered to the Custodian upon receipt thereof by the party delivering the Officer's Certificate or by the Seller; or (ii) in the case of a Mortgage where a public recording office retains the original recorded Mortgage or in the case where a Mortgage is lost after recordation in a public recording office, a copy of such Mortgage with the recording information thereon certified by such public recording office to be a true and complete copy of the original recorded Mortgage;

5.     for each Mortgage Loan that is a MERS Mortgage Loan, the original Mortgage, noting the presence of the MIN of the Mortgage Loan and either language indicating that the Mortgage Loan is a MOM Loan or if the Mortgage Loan was not a MOM Loan at origination, the original Mortgage and the assignment thereof to MERS, with evidence of recording indicated thereon, or a copy of the Mortgage certified by the public recording office in which such Mortgage has been recorded;

6.     the originals of all assumption, modification, consolidation or extension agreements, with evidence of recording thereon, if any;

7.     the originals of all intervening assignments of mortgage with evidence of recording thereon evidencing a complete chain of ownership from the originator of the Mortgage Loan to the last assignee, or if any such intervening assignment of mortgage has not been returned from the applicable public recording office or has been lost or if such public recording office retains the original recorded intervening assignments of mortgage, a photocopy of such intervening assignment of mortgage, together with (i) in the case of a delay caused by the public recording office, an Officer's Certificate of the title insurer insuring the Mortgage stating that such intervening assignment of mortgage has been delivered to the appropriate public recording office for recordation and that such original recorded intervening assignment of mortgage or a copy of such intervening assignment of mortgage certified by the appropriate public recording office to be a true and complete copy of the original recorded intervening assignment of mortgage will be promptly delivered to the Custodian upon receipt thereof by the party delivering the Officer's Certificate or by the Seller; or (ii) in the case of an intervening assignment of mortgage where a public recording office retains the original recorded intervening assignment of mortgage or in the case where an intervening assignment of mortgage is lost after recordation in a public recording office, a copy of such intervening assignment of mortgage with recording information thereon certified by such public recording office to be a true and complete copy of the original recorded intervening assignment of mortgage;

10-2

8.  if the Mortgage Note, the Mortgage, any Assignment of Mortgage, or any other related document has been signed by a Person on behalf of the Mortgagor, the original power of attorney or other instrument that authorized and empowered such Person to sign;

9.  the original lender's title insurance policy in the form of an ALTA mortgage title insurance policy, containing each of the endorsements required by FNMA and insuring the Purchaser and its successors and assigns as to the first or second priority lien of the Mortgage in the original principal amount of the Mortgage Loan or, if the original lender's title insurance policy has not been issued, the irrevocable commitment to issue the same; and

10.  the original of any security agreement, chattel mortgage or equivalent document executed in connection with the Mortgage, if any.

10-3

**EXHIBIT 11**
FORM OF MONTHLY SERVICER'S REPORT

| Field | Description |
|---|---|
| SELLER_NAME | Name of Seller (available from "Seller Management" module under "Code" field, required field) |
| ME_AS_OF_DATE | Cut off date of report (required field) |
| INV_NUMBER | Investor Number |
| SERVICER_ID | Servicer loan number |
| SELLER_LOANID | Seller loan number (required field) |
| LNAME | Last name of borrower |
| FNAME | First name of borrower |
| DATE_TRADE_FUND | Date of loan's funding with DB, I.e. date that Deutsche Bank bought the loan from the seller |
| INTEREST_RATE | Gross interest rate on loan as of end of month being reported |
| PRIN_INT_PYMT | P&I on loan as of end of month being reported |
| LIEN | Lien of the loan |
| IO_FLAG1 | Optional: Y/N flag for Interest-Only loans (where applicable) |
| BEG_UPB_ACT | Beginning actual balance |
| BEG_UPB_SCH | Beginning scheduled balance |
| END_UPB_ACT | Ending actual balance |
| END_UPB_SCH | Ending scheduled balance |
| PAID_THRU_DATE | Paid through date of the loan (required field) |
| NEXT_DUE_DATE | Next due date at end of month being reported (requried field) |
| DAYS_DELQ | Days delinquent at end of month being reported |
| PIF_DATE | Payoff date (required field) |
| PRIN_AMT_ACT | Actual collected principal remitted to DB |
| PRIN_AMT_SCH | Scheduled principal remitted to DB |
| CURTAILMENT | Curtailment remitted to DB (required field) |
| INT_AMT_ACT | Actual collected interest remitted to DB |
| INT_AMT_SCH | Scheduled interest remitted to DB |
| PREPAY_PENALTY_AMT | PPP remitted to DB |
| SERVICE_FEE_SCH | Service fee charged per loan for the month being reported on a scheduled pool |
| SERVICE_FEE_ACT | Service fee charged per loan for the month being reported on a actual pool |
| STATUS | Status of loan as of end of month being reported; "BKCY" = loan is in bankruptcy (chapter given by "BKCY_CHAPTER" field; "FBRE" = loan is on a forbearance plan; "FCLS" = loan is in foreclousre; "REO" = loan is in REO (required field) |
| BKCY_CHAPTER | Bankruptcy chapter filed |
| BKCY_START_DATE | Bankruptcy start date |
| FCLS_START_DATE | Foreclosure start date |
| REO_TRANSFER_DATE | REO transfer date |
| MISC_ADJ1 | Loan level breakdown of any miscellaneous adjustment |
| COMMENT1 | Comment describing nature of misc_adj1 |
| NON_CASH_MISC_ADJ1 | Loan level breakdown of any non cash miscellaneous adjustment |
| COMMENT1 | Comment describing nature of non cash misc_adj1 |
| MISC_ADJ2 | Loan level breakdown of any miscellaneous adjustment |
| COMMENT2 | Comment describing nature of misc_adj2 |
| NON_CASH_MISC_ADJ2 | Loan level breakdown of any non cash miscellaneous adjustment |
| COMMENT2 | Comment describing nature of non cash misc_adj1 |
| TOT_REMIT | Loan level total amount remitted to DB |
| NEG_AM | Amount of Negative Amortization, if any |

<u>EXHIBIT 12</u>

## SELLERS' UNDERWRITING GUIDELINES

<u>EXHIBIT 13</u>

DEUTSCHE BANK CORRESPONDENT LENDING SELLER GUIDE,
VOLUME 1

EXHIBIT 14
FORM OF BACK-UP CERTIFICATION

I, [identify certifying individual], certify to the [Initial Purchaser], [Mortgage Loan Seller] [Depositor], [Trustee], [Securities Administrator] and [Master Servicer] that:

(i)    Based on my knowledge, the information in the Annual Statement of Compliance, the [USAP Report]* [Assessment of Compliance and Attestation Report]** and all servicing reports, officer's certificates and other information provided by the Interim Servicer relating to the servicing of the Mortgage Loans taken as a whole, do not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading as of the date of this certification;

(ii)    The servicing information required to be provided by the Interim Servicer under this Servicing Agreement has been provided to the Purchaser and the Master Servicer;

(iii)    I am responsible for reviewing the activities performed by the Interim Servicer under the Agreement and based upon the review required by this Servicing Agreement, and except as disclosed in the Annual Statement of Compliance or the [USAP Report]* [Assessment of Compliance and Attestation Report]**, the Interim Servicer has, as of the date of this certification fulfilled its obligations under this Servicing Agreement; and7

(iv)    [I have disclosed to the Purchaser and the Master Servicer all significant deficiencies relating to the Interim Servicer's compliance with the minimum servicing standards in accordance with a review conducted in compliance with the Uniform Single Attestation Program for Mortgage Bankers or similar standard as set forth in the Servicing Agreement.]* [The Assessment of Compliance and Attestation Report of the Interim Servicer have been delivered to the Purchaser as required under the Servicing Agreement. Following is a list of all material instances of noncompliance described in the Attestation of Compliance and Attestation Report (if none, state "none"):_____.]**

INNOVATIVE MORTGAGE CAPITAL, LLC
(Interim Servicer)
By:
Name:
Title:
Date:

\* To be used if a USAP Report is being delivered under the Servicing Agreement

\*\* To be used if an Assessment of Compliance and Attestation Report is being delivered under the Servicing Agreement



Exhibit A Involuntary Repurchase Schedule

| Unpaid Principal Balance at Price | 710,500.00 |
| Accrued | 710,257.89 |
| Adverse | 2,425.87 |
| Accrued Interest | 67,001.10 |

| Loan Number | Borrower Name | UPB as of 01/01/06 | Paid to | Gross Note Rate | Net Rate | Days | Accrued Interest | Advance | Price | Price Amount | Purchase Proceeds | Funding | Per Diem Net |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6100026 111060100 | GUTIERREZ, RICARDO | $ 590,000.00 | 01/01/06 | 04/19/07 | 6.930% | 468 | $ 52,629.20 | $ - | 100.0160% | $ 594,732.80 | $ 637,362.00 | 01/26/08 | $ 112.49 |
| 6100116 111060100 | REED, RONNIE | $ 120,500.00 | 01/01/06 | 04/19/07 | 6.633% | 468 | $ 14,880.10 | $ 2,425.87 | 100.0160% | $ 151,064.00 | $ 146,570.05 | 01/26/08 | $ 33.21 |
| | | 710,500.00 | | | | | 67,001.30 | | | | | | |

**Deutsche Bank Wire Instructions:**

Bank: Bank of New York
ABA#: 021-000-018
Acct.#: GLA 111058
Beneficiary: DPX
Attn: Kennelh Glover
Ref.: Innovative repurchase



Thacher
Proffitt

Thacher Proffitt & Wood LLP
Two World Financial Center
New York, NY 10281
212.912.7400

Fax: 212.912.7751
www.tpw.com

April 26, 2007

BY FEDERAL EXPRESS AND CERTIFIED MAIL—RETURN RECEIPT REQUESTED

Mr. John Ashton
Innovative Mortgage Capital LLC
121 Innovation Drive, Suite 120
Irvine, California 92617

> Re:     Master Mortgage Loan Purchase and Interim Servicing Agreement
> dated as of October 1, 2005 between DB Structured Products, Inc.
> and Innovative Mortgage Capital LLC ("Innovative")

Dear Mr. Ashton:

Our firm has been retained as litigation counsel by DB Structured Products, Inc. ("DBSP") in connection with the Master Mortgage Loan Purchase and Interim Servicing Agreement dated as of October 1, 2005 ("Agreement") between DBSP and Innovative, and in connection with certain letter agreements between DBSP and Innovative (the "Commitment Letters", and together with the Agreement, the "Agreements"). Capitalized terms used herein and not defined have the meanings set forth in the Agreements.

DBSP hereby demands immediate payment of the amount of $786,332.65 (the "Repurchase Price") which is due and owing to DBSP by Innovative in connection with Innovative's obligation to repurchase the mortgage loans listed on Exhibit A attached hereto (the "Mortgage Loans") pursuant to the Agreements. The Mortgage Loans are in early payment default, as specifically set forth in the Commitment Letters.

Please remit the Repurchase Price by wire transfer to the following bank account no later than May 10, 2007:

|  |  |
|---|---|
| Bank: | Bank of New York |
| ABA: | 021000018 |
| Acct. #: | GLA/111569 |
| Acct. Name: | DPX |
| Attn.: | Ken Glover |
| Re: | Innovative Repurchase |

April 26, 2007                                                                    Page 2.

If you fail to remit the Repurchase Price by that date, please be advised that DBSP will commence formal legal action against Innovative to recover the amounts owed without further notice.

Nothing contained in this letter shall constitute a waiver of any of DBSP's rights or remedies under the Agreements, at law or in equity. Nor shall this letter be construed as a waiver of any Event of Default by Innovative under the Agreements.

Please call me or Steven Paolini, Esq., Vice President and Counsel, Deutsche Bank AG, at (212) 250-0382 should you have any questions or wish to discuss this matter.

Very truly yours,

John P. Doherty

cc:    Steven Paolini, Esq.
       Mortgage Loan Specialists, Inc.
       514 Via De La Valle, Suite 202
       Solana Beach, CA 92075

Encl.

### Exhibit A Repurchase Repurchase Schedule

| | |
|---|---|
| Unpaid Principal Balance at Price | 710,000.00 |
| Advance | 710,287.83 |
| Accrued Interest | 2,425.67 |
| | 67,030.30 |

| Loan Number | Borrower Name | Unpaid Principal Balance | Next Pmt Due Date | Paid Thru Date | Interest Rate | Net Days Accrued | Accrued Interest | Advance | Price | Principal Price | Accrued Price | Wire Date | Per Diem Int. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6109520 | GUTIERREZ, RICARDO | $ 580,000.00 | 01/01/2008 | 04/01/2007 | 6.500% | 458 | $ 62,823.20 | $ - | 100.816500% | $ 584,732.50 | $ 637,152.00 | 01/28/2008 | $ 112.08 |
| 61201118 | REED, RONNIE | $ 130,500.00 | 01/01/2008 | 04/01/2007 | 6.530% | 458 | $ 14,980.10 | $ 2,425.67 | 100.816500% | $ 131,534.98 | $ 146,770.88 | 01/28/2008 | $ 32.01 |
| | | 710,500.00 | | | | | $ 57,803.30 | | | | | | |

**Deutsche Bank Wire Instructions:**

| | |
|---|---|
| Bank: | Bank of New York |
| ABA#: | 021-000-018 |
| Acct#: | GLA 111509 |
| Beneficiary: | DPX |
| Attn: | Kenneth Glover |
| Ref: | Innovative repurchase |